**SMITH v. ST. PAUL FIRE & MARINE INS. CO.**

No. L–7579.

District Court, E. D. New York.

Dec. 28, 1938.

William Otis Badger & Son, of New York City, for plaintiff.

Bigham, Englar, Jones & Houston, of New York City (John M. Aherne and John L. Quinlan, both of New York City, of counsel), for defendant.

BYERS, District Judge.

The above entitled action was instituted on the law side, and the complaint (verified

November 27, 1937) recites that the deceased, Lewis C. Smith, on June 13, 1930, was the sole owner of an unincorporated business known as Lewis C. Smith Agency, an insurance enterprise which he conducted at 24 Stone Street in the Borough of Manhattan, and that on or about that date he conveyed a one-half interest therein to his wife, the plaintiff, "however, retaining entire control of the active management of said business as well as all the profits therefrom from the date of the assignment up to the time of his death".

It elsewhere appears that the latter event occurred on July 31, 1937.

The complaint continues, that on or about December 5, 1931, the said Smith entered into an insurance agency agreement with the defendant company, which continued without interruption until his death, and that, shortly before the latter event, the defendant company authorized Mrs. Smith to operate the agency with all the authority which had been possessed by her husband, and that on or about August 6, 1937, she was induced to permit the defendant company to audit and examine the records and files of the insurance agency, as the result of wrongful representations made to her on behalf of the defendant; that as a result of the latter, she permitted the defendant to make the inventory and examination in question, in the course of which the defendant removed from the office of the agency all records, books, documents and files thereof, the return of which has been refused, although duly demanded by the plaintiff.

That about September 1, 1937, the defendant wrongfully advised the customers of the agency that the latter had terminated "but that the customers' contract with the defendant continued and that all premiums should be paid directly to the defendant".

That the defendant wrongfully converted, usurped or appropriated the business of the agency, and took into its employ all the employees of the agency, to the damage of the estate of Smith in the sum of $50,000.00.

The second cause alleges the same conversion, to the damage of the plaintiff in her individual capacity, in a like sum.

The answer (verified March 28, 1938) contains, in addition to denials, two affirmative defenses and two equitable counterclaims, which are pleaded in lieu of a separate bill in equity.

To the latter, a replication was filed, containing several affirmative defenses to the equitable counterclaims.

In this state of the pleadings, a motion was made by the defendant, which resulted in an order, dated May 27, 1938, directing that the issues raised by the equitable defenses and counterclaims, in the defendant's answer and the replication thereto, be transferred to the equity side of this court for hearing and determination prior to the trial of any issue in the law suit; the trial of the latter was stayed until the determination of the equitable issues. The latter were brought on for hearing October 17, and continued on all court days until November 2. The testimony and exhibits are so considerable in the aggregate as to forbid extended comment herein.

From the evidence so adduced, it is found that the Smith agency for the defendant company had its origin in an interchange of correspondence which did not ripen into a single document constituting a contract between Smith and the defendant company. In substance, a power of attorney was granted to the former to sell baggage insurance policies of the defendant company, the premiums upon which were to be collected by Smith, and he was to deduct therefrom 47½% as his commission for procuring the business.

He was to pay his own office expenses and the commissions allowed by him to solicitors, and their license fees where exacted by local law, and also the fees of adjusters employed to adjust losses arising under policies issued by or for the Smith agency.

Such losses, when adjusted, were paid by the defendant company.

During 1937, the defendant agreed that Smith should participate in the defendant's net profits from the Smith agency business, to the extent of 20%. An earlier understanding for a smaller participation was thus superseded, and that of 1937 continued in effect until Smith's death.

The business of the agency consisted in the sale of such insurance policies through agents (herein called solicitors, for convenience) who solicited the business from travelers upon railways, steamship lines, and intending travelers who

purchased their tickets at the offices of tourist agencies.

So much of the business as was written in connection with railway travel does not present any matter for consideration in the equity aspect of this litigation. Steamship and tourist agency business alone are presently involved.

The policies were written in triplicate by the issuing agents, and the first or white copy was delivered to the insured; a blue copy was forwarded to the Smith agency, and a third copy, which was either pink or buff, was retained by the solicitor.

When the blue copies were forwarded to the Smith agency, they were customarily accompanied by a check to the order of the latter for the amount of the premiums less the solicitor's commission; Smith in turn forwarded the blue copy to the defendant company, together with his check for the premium less his 47½% commission.

In practise, it was found expedient to perform this latter operation by assembling a group of policies and sending one check to cover the company's share of the premiums, because the policies were individually for small amounts and in many cases the company's share of the premium was only a few cents.

In order that the necessary information respecting each policy covered by a given payment might be tersely and accurately set forth, a form was devised, conveniently spaced in columns, and this accompanied a group of policies and a check of the Smith agency for the total amount due to the defendant. This form was called a bordereau.

So long as that practise continued, the defendant had complete advice respecting the policies under which it was liable, the gross premiums charged, and its percentage thereof.

On or about April 11, 1932, the defendant consented, at Smith's request, to forego receiving the blue copies of the policies and to accept only the bordereaux and check accompanying each, because the packages containing the policies were bulky and expensive to send.

That opened the door to Smith to withhold knowledge from the company of the total policies actually issued, and to retain such of the premiums as were forwarded to him by the solicitors, as he chose to keep. He could not pursue such a practise blindly, because, if a claim of loss were to be made, the company had to respond, and con-

sequently under such circumstances the company had to know of the issuance of the policy.

Because this was a large business on a small scale, and because of the expense of maintaining the records in the Smith agency which involved considerable clerical assistance, the attitude of the company was somewhat lenient with respect to delays in making up the bordereaux, and transmitting premiums.

It should be said that a large part of the policies were for a duration of only a week, ten, thirty, or sixty days, as the case might be, depending upon the length of a given policyholder's trip, and consequently claims for loss would be presented within varying intervals of time; experience demonstrated that, if a claim was not made within a year, it was not likely to be made at all; hence, if policies a year old were not reported to the company, the latter, in most cases, need never know that they had been issued at all.

A practise grew up in the office of the Smith agency, particularly during the last three years, of allowing the blue policies to accumulate in the files in very considerable volume, in spite of the fact that, as to each of them, the agency had received the amount of premium, paid to it either promptly upon the issuance of the policy or not more than fifteen days later. The last remark means that policies issued through the Hamburg American Line and North German Lloyd, and the International Mercantile Marine Co. were the subject of semi-monthly remittances through the offices of those companies to the Smith agency, so that at no time was the Smith agency delayed more than fifteen days in the receipt of premiums from those solicitors.

The evidence is persuasive that Smith designedly and deliberately withheld from the defendant during the last three years a very considerable part of the premiums received in the office of the agency, and the figures with reference to the two steamship lines which have been named demonstrate that $13,000.00 in round figures, which belonged to the defendant, was retained by Smith.

It is unnecessary to discuss other and smaller items which were proven in substantial numbers, or to state in detail the technique of the Smith agency in bringing about this result. It is found that the withholdings alluded to in this paragraph on the part of Smith have been established.

With this understanding of the testimony, it is requisite to discuss the defenses and counterclaims which were separately tried on the equity side of the court.

Paragraphs XVI to XXVIII of the answer comprise the first equitable counterclaim in lieu of a separate bill in equity, and allege the facts which have heretofore been stated in narrative form, and other matters.

Paragraph XX alleges that the relationship existing between the defendant and Lewis C. Smith "was fiduciary in character and said agent owed to defendant the highest good faith and the fullest disclosure".

That paragraph is admitted in the replication and therefore no issue thereon arises, and it is so found.

In paragraph XXII, it is alleged that the defendant company first ascertained shortly after his death, that Smith had concealed from the defendant the collection of large sums of money constituting the premiums on policies, and had rendered false reports in respect thereof, and had fraudulently withheld and appropriated these sums of money.

The plaintiff denies that allegation, but the court finds it to have been established by the evidence.

Also the same paragraph alleges that Smith had failed to keep and maintain adequate books and records of the business and affairs of the defendant, and had falsified the records of the defendant's business and concealed or destroyed other records thereof.

The denial of course covers the foregoing aspect of that paragraph, but the evidence is persuasive that the allegation is true and it is accordingly so found.

Paragraph XXIII alleges that such premiums collected by Smith were so collected by him as agent of the defendant and were held and required to be held in trust by him for the said defendant.

That is denied in the replication, but it is found that the allegation is true.

Paragraph XXIV alleges that the defendant is lacking in knowledge as to the number of policies and the amount of money collected by Smith as agent of the defendant, and that no accounting has ever been made by Smith or the plaintiff.

The finding is that this allegation is true.

Paragraph XXVI deals with alleged unfair and unlawful competition on the part of the plaintiff in obtaining knowledge and information of the defendant's business and in threatening to use such information for the purpose of injuring the defendant's business.

The evidence is not deemed to establish those allegations, and there will be no affirmative finding in respect thereof.

The same remark applies to paragraph XXVII as to the defendant's standing in the insurance world, and the insight into its methods said to have been gained by the plaintiff.

Paragraph XXVIII alleges that the defendant has no adequate remedy at law and needs an accounting and discovery.

It is so found, and concluded.

The second equitable counterclaim is addressed to the plaintiff's individual ownership of a one-half interest in the agency and her temporary appointment during the last stages of her husband's illness, and the revocation of that appointment during the early days of August, 1937.

All of those allegations are admitted.

Paragraphs XXXIII and XXXIV charge that during the period of the agency, the plaintiff received and disbursed large sums of money belonging to the defendant, which were trust moneys and collected by her in a fiduciary capacity.

So far as the foregoing applies to the period of time in which the plaintiff functioned individually for a few days just prior to and following her husband's death and until the revocation of her authority, the finding is in favor of the defendant, but as to the period of time during which Smith was alive, no such finding can be made. This for the reason that, while she was named as the assignee of a one-half interest in the agency, it does not appear that she ever became a partner in the sense that she received any share of the profits, as such, or was liable for any share of the losses; conversely, the evidence indicates that Smith functioned individually and exclusively in the conduct of the agency, in spite of the execution and possible delivery of the assignment of the one-half interest to which reference has been made. The cases relied upon by the defendant have been examined, but are deemed not to establish the contention that the plaintiff has been shown to have been a dormant or undisclosed partner of her husband.

■ Turning to the affirmative defenses to the equitable counterclaims, contained in the replication, it appears that:

The first asserts that on March 11, 1937, an account was stated between plaintiff's testator and the defendant, which indicated that there was no balance due to defendant from Smith. The evidence touching that allegation requires brief discussion.

As the agency was operated, a practise developed whereby the defendant company paid directly certain of the license fees of the solicitors (called agents) and certain of the adjusters' fees incurred in the making of adjustments of claims. Those items constituted a claim on the part of the defendant company against Smith, and a balance in favor of the former accumulated over a period of a few years. That balance was substantially written off under date of March 11, 1937, by the defendant, and Smith was given a 20% participation in the net profits of the defendant company arising from the operations of his agency.

That was not an account stated between Smith and the defendant company which involved adjustment of claims on the part of the company against him or premiums which he had withheld, because the company knew nothing of such claims; as to that the evidence is not in doubt, or even close.

Therefore, since there was no dispute between the parties involving the subject of premiums withheld, there was no basis for an account stated, and it accordingly is found that there was none in law or in fact.

■ The Eleventh paragraph, asserting a second affirmative defense, is to the effect that the defendant company accepted Smith's remittances as heretofore described "with ample opportunity to verify them with the agency records", as a result of which there has been a complete accounting of and payment of all agency accounts up to the date of the death of Lewis C. Smith.

The foregoing probably hints at an estoppel as against the defendant, but no basis for it has been shown. There is no act or omission on the part of the company which is shown to have caused Smith to change his position, and it would be grossly inequitable to conclude that, because Smith sought the consent of the company to discontinue furnishing to it the blue copies of policies, the latter should now be estopped to assert that, after the company had acquiesced in his suggestion, it now appears that he converted a substantial sum in premiums which he received as the defendant's agent.

It is found that this second affirmative defense has not been sustained.

■ The third affirmative defense charges the defendant with laches but, since the evidence is persuasive that the discovery of Smith's repeated breaches of his fiduciary duties was not made until after his death, it is clear that the finding must be against the allegations of this defense.

■ The fourth affirmative defense has to do with the taking possession of all books of account, records and files of the Smith agency by the defendant during the month of August, 1937, and the refusal to return them which is said to give rise to an estoppel against the defendant from demanding an accounting from the executrix of Lewis C. Smith, deceased.

The evidence discloses that the delivery of the books of account, records, etc., was with the consent of Mrs. Smith, and the demand, so-called, upon her part, for the return thereof, and the failure to comply therewith, require brief discussion:

On August 5, 1937, the defendant was first apprised of probable condition of affairs as above imperfectly outlined, and two days later Mrs. Smith's special authority to function in her husband's place was revoked. Sundry consultations between the interested parties ensued, with the result that Mrs. Smith consented to the possession of the books and records of the agency on the part of the defendant for the purpose of inventory and audit, on August 31st; and on the following day she authorized the removal of all office equipment from the Smith agency premises to those occupied by the local general agent of the defendant company. As to the latter items, it is assumed, for present purposes only, that such articles of property were subject to return on demand.

A demand was made on November 9th and repeated ten days later, for the return of both the records and the office equipment (Exhibits FF and GG). That demand was complied with only as to personal papers of the decedent, twenty-one check books, and many cancelled vouchers.

It is thought that these circumstances do not create an estoppel as against the defendant so far as its legal right to an accounting is concerned. Doubtless they

present physical or mechanical difficulties in respect of compliance with the decree, but they do not impair the defendant's equitable remedy to an accounting touching the handling of fiduciary funds, by Lewis C. Smith as agent of the defendant.

It is concluded, as a matter of law, that no estoppel has arisen in favor of the plaintiff against the defendant by reason of the matters alleged in the Fifteenth paragraph of the replication.

Paragraphs Sixteenth and Seventeenth assert a first affirmative defense to the equitable counterclaim, in that the plaintiff is said to have rendered statements of account and made payment thereunder "of all indebtedness due from herself individually to defendant except in so far as she was prevented from so doing by the acts of the defendant in discharging her and seizing the records and books of account of the Lewis C. Smith Agency", and paragraph Seventeenth alleges that said statements of account and payments were received by the defendant without objection.

It is found that Mrs. Smith paid over to the defendant some of the money for which she was accountable individually, but whether there is a balance due from her to the defendant has not been shown.

The second affirmative defense to the equitable counterclaim has to do with the alleged failure to return books of account, records, etc., and has heretofore been discussed. It is found that this defense is insufficient so far as the defendant's legal right to an accounting is concerned.

As a third affirmative defense, it is alleged that from August 2, 1937, to August 7, 1937, the plaintiff individually was agent for the defendant and actually functioned under the immediate supervision of the defendant, and did nothing otherwise.

The evidence as to supervision is to the contrary, as will be the finding in reference to this paragraph.

The defendant has amply demonstrated that an accounting between the parties is requisite to an understanding of their mutual rights and responsibilities. Indeed, the pleadings, proof and briefs are to the effect that the controversy cannot otherwise result in rational determination.

The practical aspect of affairs is that such books and records as were in the premises of the Smith agency at July 31, 1937, are now in the defendant's custody and possession with the plaintiff's consent; and that she has neither the means nor the facilities to prepare such an accounting, and that the trial of her cause of action at law is necessarily stayed until the issues raised in the proceedings on the equity side of the court shall have ripened into final decree.

It is believed that the requirements of justice will be served by the following disposition of the equity aspect of this cause:

The defendant to prepare a statement in debit and credit form, to the fullest extent and detail that the books and records in its possession disclose, covering the transactions of Smith and the Smith agency with and for the defendant, from April 11, 1932, to September 1, 1937 (or so much of that period as the parties may agree upon) except as to baggage insurance written in connection with railroad transportation.

That statement to be tendered by the defendant to the plaintiff as presumptively correct, subject, of course, to her right to verify, audit, correct, amend or amplify in accordance with her understanding of the said records, or in the light of what may be shown by any authentic records of the Smith agency which are not in the defendant's possession.

The plaintiff will be given the option either to file that statement as her accounting in this cause, as so amended or corrected by her, for settlement; or to make and file an account prepared by herself, the settlement of which can then be had.

If she elects to pursue the latter course, a master will have to be appointed forthwith, and the books and records now in defendant's possession and custody will have to be held subject to his order and control, for the purpose of permitting the plaintiff to have reasonable access thereto for the purpose of preparing the accounting.

Such proceedings as shall be found requisite respecting the settlement of the account will go forward before the master as he may determine.

It is true that this procedure will delay the presentation of the plaintiff's suit at

law, but that seems to be an inevitable consequence of the existing situation. The plaintiff asserts the conversion by the defendant of a valuable property which she says belonged to her; no one can know the value of that property, assuming for argument that there was in fact any conversion, without first ascertaining whether the Smith agency, namely, the deceased Mr. Smith, was a debtor to or a creditor of the defendant at the time of his death.

It is not intended to imply by what has been written, that any views are presently held as to the legal nature of the agency at the time of Lewis C. Smith's death; whether it constituted an asset of his estate as a going concern, will probably have to be determined in the action at law.

But, upon the pure assumption that it was, the value to be attributed to it will necessarily involve an accurate showing of its net earnings over a period of years, which cannot be established until such an accounting as is herein ordered has been had.

Settle interlocutory decree, and findings if more detailed ones are desired, upon five days' notice.